UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DIANE LACADIE, *pro se*, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civ. No. 07-101-B-W |
| | ) | |
| TOWN OF MILFORD, | ) | |
| | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION

The plaintiff, Diane Lacadie, is the former town clerk and a current selectwoman of the Town of Milford. She commenced this civil action against the Town *pro se*, claiming that the Town is liable for money damages for subjecting her to a hostile work environment and for terminating her employment as a civil servant after she filed a charge of discrimination with the Maine Human Rights Committee. The Town has filed a motion for summary judgment and requests that judgment enter against all of Ms. Lacadie's claims as a matter of law. I recommend that the Court grant the motion.

### FACTS

The Town of Milford has filed a statement of material facts supported, in the main, by record citations. Ms. Lacadie has filed an opposing statement, but it is not supported by record citations. Her complaint is not verified under oath or affirmation, although Lacadie did file an affidavit in support of her motion to amend the complaint. (Doc. No. 9.) Ms. Lacadie has filed a few items with her responsive memorandum, which are mentioned in the facts below, but none appears able to generate a genuine issue of material fact. The state of the record requires some

further comment concerning Local Rule 56 and its implications for *all* litigants, including *pro se*

litigants.  United States District Court Judge John Woodcock recently described the situation

thusly in <u>Palm v. Sisters of Charity Health Services</u>, another case with a *pro se* plaintiff:

> Local Rule 56 requires that the non-moving party on summary judgment submit
> "a separate, short, and concise statement of material facts . . . [that] shall admit,
> deny or qualify the facts . . . of the moving party's statement of material facts."  D.
> Me. Loc. R. 56(c).  Denials and qualifications require "a record citation."  <u>Id.</u>
> This record citation must be made to "the specific page or paragraph of identified
> record material supporting the assertion.  The court may disregard any statement
> of fact not supported by a specific citation to record material properly considered
> on summary judgment."  <u>Id.</u> at 56(d).  In her summary judgment responses, Ms.
> Palm cites her complaints, which were not signed under oath or penalty of
> perjury. She did not include a separate affidavit or sworn statement of facts that
> would provide record support for her denials or additional facts.  *Rec. Dec.* at 5.
>
> Ms. Palm asserts that she did not know that she had to submit such record
> evidence, and that such a requirement for a *pro se* litigant is unfair.  *Pl.'s Obj.* at
> 3-4.  She contends that the Court should have "recognize[ed] the obvious, which
> is Plaintiff was unaware that she needed to file a response to the Defendants'
> statement of material facts in the form of an affidavit."  *Pl.'s Obj.* at 5.  Further,
> on January 4, 2008, seven calendar days after the Magistrate Judge issued her
> recommendation, Ms. Palm filed a motion to file a sur-reply, together with a
> notarized affidavit as to the truth of the facts she presented in her summary
> judgment motion.  *Resp. to Statement of Material Facts with Incorporated Aff.
> and Additional Statement of Facts* (Docket # 43) (*Pl.'s Resp.*).  She urges the
> Court to take this document into account in ruling on her objections to the
> Recommended Decision.  *Pl.'s Obj.* at 3.
>
> First, regarding Ms. Palm's fairness arguments, the First Circuit has "consistently
> held that a litigant's 'pro se status [does not] absolve him from compliance with
> the Federal Rules of Civil Procedure.'"  <u>FDIC. v. Anchor Prop.</u>, 13 F.3d 27, 31
> (1st Cir. 1994) (quoting <u>United States v. Heller</u>, 957 F.2d 26, 31 (1st Cir. 1992))
> (alteration in original).  "This applies with equal force to a district court's
> procedural rules."  <u>Id.</u>;  <u>see also</u> <u>Ruiz Rivera v. Riley</u>, 209 F.3d 24, 27-28 & n.2
> (1st Cir. 2000);  <u>Posadas de Puerto Rico, Inc. v. Radin</u>, 856 F.2d 399, 401-02 (1st
> Cir. 1988). "[P]roceeding *pro se* does not otherwise relieve a litigant of the usual
> requirements of summary judgment, and a *pro se* party's bald assertions,
> unsupported by evidence, are insufficient to overcome a motion for summary
> judgment."  <u>Parkinson v. Goord</u>, 116 F. Supp. 2d 390, 393 (W.D.N.Y. 2000);  <u>see
> also</u> <u>Andrews v. City of Calais</u>, No. 05-43-B-W, 2005 U.S. Dist. LEXIS 34778,
> *3-4 (D. Me. Nov. 9, 2005).

> Second, concerning Ms. Palm's subsequent submission of an affidavit and evidence, the Court may not take these filings into consideration in its review of a determination already made by the magistrate. "Parties must take before the magistrate, not only their best shot, but all of their shots." <u>Borden v. Sec'y of Health and Human Servs.</u>, 836 F.2d 4, 6 (1st Cir. 1987) (internal quotation omitted).

537 F. Supp. 2d 228, 229-30 (D. Me. 2008). The implications of the <u>Palm</u> decision for this case are relatively straight-forward. Like Palm, Lacadie has not supported any of her qualifications or denials of the Town's statements with a record citation to her sworn deposition testimony or to an affidavit or other admissible evidence. If there were a sworn affidavit present in the record that did set forth material facts in a reasonably succinct fashion, I would give Lacadie the benefit of it. <u>See</u> <u>Clarke v. Blais</u>, 473 F. Supp. 2d 124, 128 (D. Me. 2007) (incorporating *pro se* litigant's affidavit testimony despite non-compliance with Local Rule 56). However, in the present case the affidavit that Lacadie provided fails to set forth facts that can be woven into the existing summary judgment record in any sort of coherent fashion. As for depositions, Lacadie's efforts to qualify or deny the Town's statements do not even suggest the possibility that favorable evidence is available in her deposition transcript or any of the other transcripts in the record.[1] Nevertheless, I have incorporated some of Lacadie's favorable deposition testimony to the extent the Town's citations have caused me to review it.

The following facts are material to the summary judgment motion. They are drawn from the parties' statements of material facts in accordance with Local Rule 56. <u>See</u> <u>Doe v. Solvay Pharms., Inc.</u>, 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion);

---

[1] Unless Lacadie has a copy of her deposition transcript, she likely could not have referred the Court to any testimony not already referenced by the Town. Counsel for the Town did not file complete transcripts, only redacted copies. This highlights the utility and appropriateness of filing an affidavit in support of the plaintiff's case.

Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Diane Lacadie worked for the Town of Milford for several periods of time, most recently February 4, 2002, through January 17, 2006. During the year 2005, she held the position of town clerk, general assistance administrator, and agent for state programs.[2] Working with her in the office on a regular basis were James Hancock,[3] the town manager, Cindy Grant, the town treasurer, and Darcie Carson, the tax collector. Other individuals affiliated with the Town who came to the office on an irregular basis were Francis Richard, a town selectman, and Mark Gibson, an independent contractor hired by the Town to serve as an assessor's agent for purposes of assisting in the revaluation of real estate in Milford.

The record reflects that the work environment at the Milford town office was not free of sex-themed joking, including the occasional joke that might be regarded as offensive by some. There does not appear to be any evidence that Lacadie found this joking to be offensive or threatening in any way. (Def.'s Statement of Material Facts (DSMF) ¶ 33, 34, Doc. No. 12.) Lacadie admits the Town's statement that she received one e-mail from Hancock that she considered sexually explicit and obscene, but that she did not feel discriminated against or harassed by it.[4] (Id. ¶¶ 39, 40; Pl.'s Response to Def.'s Statement of Material Facts §¶¶ 39, 40; Lacadie Dep. 104-105.) There is also some evidence of teasing or workplace antics. Gibson had

---

[2]     Defendant includes as paragraph 4 of its statement of material facts that Lacadie was elected to the Town of Milford Board of Selectmen in June 2006, and her term continues until June 2009. Lacadie admits this statement.

[3]     Hancock was town manager from December 5, 2003, through May 1, 2006, when he resigned. (DSMF ¶ 16.)

[4]     In her affidavit, Lacadie says: "Rather than investigating my charge of sexual harassment, the Town Manager repeatedly sent me sexually explicit, obscene materials to me through the Town's e-mail system." (Lacadie Aff. ¶ 8, Doc. No. 9.) Given Lacadie's deposition testimony and her admissions to statements 39 and 40, I do not conclude that this paragraph does anything to advance Lacadie's claim of hostile work environment/sexual harassment as it relates to the incident with Gibson which appears to be the heart of her claim, because there is no record development of any material about Hancock other than the deposition testimony I set forth and this paragraph of the affidavit.

4

on occasion called Lacadie the "welfare queen" because she handled the Town's general assistance program.  (Id. ¶ 35.)  Additionally, Gibson made comments about Lacadie's hair such as:  "What color is it today?"  (Id. ¶ 36.)  Lacadie regarded Gibson as rude, vulgar, ignorant, loud and arrogant.  (Id. ¶ 37.)  On one occasion Hancock embarrassed and shocked Lacadie by dropping his pants to show her and two other female employees an injury on his knee that had to be operated on.  This event may have happened in 2004 or 2005.  (Id. ¶ 41;  Lacadie Dep. 119.) There is no indication that this particular incident was laced with any sexual innuendo and there is no evidence that it was at all proximate to the events giving rise to this litigation.

Joking and antics aside, there is evidence that men in the office, including the town manager who supervised the others, directed sexual comments at the women in the office. Lacadie testified at her deposition that Gibson, Hancock and Richard "are all pigs" and that sexual comments were made by the men to the women in the office, but she does not indicate when or by whom or how regularly.  (Id. ¶ 42;  Lacadie Dep. 120-21.)  It appears, however, that all of the men in the office felt comfortable making comments to the women.  Although it is unknown who said what, the comments included the following:  "nice ass, geez you look hot today, that must be a Victoria Secret bra, if those legs get any longer, Darcie, you could wrap them around my neck three times."[5]  (Lacadie Dep. 120.)  It would appear from the record that the women in the office put up with these inappropriate comments without protest.  (Id. at 121.) Against this general backdrop the following incident occurred.

---

[5]      These facts are not offered in either party's statement of material facts, yet they are available from the deposition transcript pages that the Town cites in support of its own statement that "Gibson, Richard *and* Hancock made sexual comments directed at specific employees."  (DSMF ¶42 (emphasis added), citing Lacadie Dep. 120-21.)  As a *pro se* litigant, Lacadie is entitled to some indulgence in this regard, which is why I have included in my factual recitation the nature of the comments that were made, but as is discussed below, Lacadie still fails to incorporate these facts into her memorandum.  That omission is harder to ignore.

On January 26, 2005, Gibson entered Lacadie's private office and sat down on her lap with his legs straddling hers, while she sat behind her desk in an office chair.  Gibson placed his hands over Lacadie's ears and kissed her forcefully on the lips.  This was the first and last time Gibson touched Lacadie in a way she found offensive.  (Id. ¶¶ 13, 14.)  Lacadie promptly reported the incident to Hancock, to Richard, and to Grant and Carson.  (Id. ¶¶ 15, 21.)  Hancock maintains that he told Gibson that Gibson's conduct was inappropriate.  (Id. ¶ 16.)  Richard contends that he warned Gibson that Gibson would be out of a job if it happened again.  (Id. ¶ 18.)  Carson testified that she was present in the office when Gibson came out of Lacadie's office, and that she saw Lacadie come out of the office "making gagging noises, and laughing and wiping her mouth."  Carson described Lacadie as "grossed out" but not crying or upset.  (Id. ¶ 21.)  Lacadie admits this statement, but attributes her laughter to nerves rather than amusement.  This qualification is not supported by any record citation.  Grant asserts by affidavit that Lacadie did not appear to be angry with Gibson.  (Id. ¶ 22.)  This statement is denied without a supporting citation.

Sometime after the incident, Lacadie told another selectman, Mike Hildreth, about the incident.  Hildreth offered to speak to Gibson directly but Lacadie stopped him from doing this because she believed Hancock would take care of the situation.  (Id. ¶ 19.)  Lacadie wanted Gibson's kiss to be documented in Gibson's file, and for Gibson to apologize to her and acknowledge that the kiss was wrong.  However, Gibson never apologized to Lacadie or acknowledged to her that what he did was wrong.  (Id. ¶ 20.)

In June of 2005, Gibson visited the home of Lacadie's son for purposes of revaluing the property.  (Id. ¶ 23.)  Lacadie regarded this action as retaliatory, although she has no ownership interest in the property.  (Id. ¶¶ 23, 24.)  Following this incident, Lacadie made many statements

6

to Hancock that she wanted the Town to fire Gibson.  (Id. ¶ 26.)  Grant attests by affidavit that Lacadie's conduct changed following the incident.  She states that Lacadie was visibly angry, used profanity and criticized Gibson in the office, something she had not done previously.  (Id. ¶ 22.)  Hancock similarly attests that Lacadie had not made any complaints about Gibson since the kiss incident, until after the revaluation incident.  (Id. ¶ 25.)  Lacadie denies these assertions, but without any supportive citation of the record.  According to Hancock, Lacadie's first accusation of sexual harassment was levied in the wake of the revaluation.  (Id. ¶ 26.)  Lacadie says she accused Gibson of harassment on the date of the kiss, but she does not offer or point the Court to any sworn statement in support of such a finding.

Based on Lacadie's complaint that she did not want to be present when Gibson was in the office, Hancock decided to give Lacadie paid leave every Wednesday, the one day of the week on which Gibson worked in the town office.  (Id. ¶¶ 27, 29.)  Initially, Lacadie took vacation time for Wednesdays, but by the end of September the Board of Selectmen approved the time off as paid administrative leave.  (Id. ¶¶ 30, 31.)  Meanwhile, in July 2005, one month after the incident involving Gibson's revaluation of Lacadie's son's property, the Town gave Lacadie an eight percent merit raise for her work ethic and job responsibilities.  (Id. ¶ 86.)

Sometime in September of 2005, Ms. Grant, the treasurer, told Hancock about a previous incident in which Lacadie had changed her excise tax form to reduce the excise tax due to the Town.[6]  Hancock regarded the statement as a red flag and decided he had a duty to investigate

---

[6]      In 2002, an issue as to the excise tax Lacadie paid in connection with her 2002 registration for a Monte Carlo arose and was addressed by Richard, then the chair of the Board of Selectmen, who reviewed the matter together with a former town manager and former town auditor.  (Id. ¶¶ 87, 88.)  The circumstances are not entirely clear, but Richard recalls that there was no determination that Lacadie had engaged in misconduct and that he had expressed the view at that time that Cindy Grant should be fired, but that it was up to the then town manager to decide what to do.  (Id. ¶ 89.)  The then auditor attests that he remembers the incident well and that he has no recollection that Grant or Lacadie were considered complicit in anything.  (Id. ¶¶ 92-95.)  It is unclear whether the town manager at the time was available as a witness.  Lacadie has filed a "to whom it may concern" letter authored by Dawn C. Cyr.  The letter relates to this 2002 incident, but it is unsworn and therefore inadmissible as evidence.

the matter.  (Id. ¶¶ 45, 47.)  According to Grant's affidavit, she made the statement to Hancock after hearing that Lacadie was threatening to sue the town.  She relates that she told Hancock that Lacadie "stole from the Town and got away with it" and that she would "get away with this too." (Id. ¶ 46;  Grant Aff. ¶ 15.)

Hancock reviewed the motor vehicle registrations on file for Lacadie and members of her family.  He sought assistance from TRIO Software, the vendor that sold the motor vehicle registration software used by the Town.  (Id. ¶49.)  Hancock concluded that Lacadie had improperly lowered the excise taxes levied on three family vehicles by changing the mil rate assigned by the registration software and by improperly reducing the vehicles' base values.  (Id. ¶¶ 50-53, 55-57, 78.)  Lacadie denies all of these assertions of misconduct on her part, without offering any citations to countervailing evidence.

The Town of Milford obtained expert opinion testimony from TRIO Software's Application Consultant, Scott Roberts, regarding TRIO's Motor Vehicle System.  Roberts has attempted to determine whether de-selecting options could explain a $4,000 reduction in the base price of a Monte Carlo in the June 24, 2003, registration for that vehicle.  He concludes that de-selecting options cannot explain that reduction and opines that the reduction was caused by directly modifying the base price during the registration process.  (Id. ¶ 77.)  Additionally, according to Roberts, when the Monte Carlo was re-registered on July 3, 2002, an incorrect mil rate was used.  The mil rate for year 1 or 2 should have been used.  The registration form indicates a mil rate for mil year 5.  According to Roberts, the software would have defaulted to the proper mil rate based on the VIN of the vehicle and the person performing the registration would have to have manually changed the mil rate to prevent the default rate from applying.  On

---

Lacadie does not refer to it in her brief and it is unclear what facts she would have the Court draw from it, even if it were of evidentiary quality.  (Aug. 6, 2007 Cyr Letter, Doc. No. 17-5.)

the two subsequent re-registrations, on June 24, 2003, and August 6, 2004, the wrong mil rate was again used.  (Id. ¶ 78.)  Roberts similarly opines that the base price figures entered for a Nissan 300ZX and a Toyota Supra were manually lowered by amounts that cannot be explained by the mere de-selection of vehicle options using the software interface.  (Id. ¶¶ 79, 80.)

Lacadie filed a charge of discrimination with the Maine Human Rights Commission on October 12, 2005.  (Id. ¶ 2.)  The charge relates that a coworker assaulted Lacadie in her office, that she reported the assault to the town manager, that no action was taken, that her son's property taxes were increased in retaliation and that she was forced to be in the town office with her assailant.  (Id.;  Lacadie Dep. Ex. 7.)  Lacadie amended her charge on October 13 to specifically describe Gibson's assaultive behavior.  (Lacadie Dep. Ex. 8.)

On December 7, 2005, the Milford Board of Selectmen voted unanimously to move Gibson's office out of the town office and into the town meeting hall area.  This move never occurred.  The Town contends the move never occurred because it was not feasible to move all of the records the assessor's agent would need to access to the town meeting hall area, as other town employees regularly had to use them in the town office.  (Id. ¶ 32.)  Lacadie denies that the selectmen ever actually intended to relocate Gibson.  Another possible explanation is that on December 13, 2005, Hancock authored a letter to Lacadie stating that he was "considering disciplinary action" based on his review of motor vehicle registration records.[7]  (Id. ¶ 59; Hancock Decl. Ex. 2.)  Hancock outlined his findings and provided Lacadie with documentation so she could review his findings in advance of a pre-termination hearing.  (DSMF ¶ 59.)  Hancock suspended Lacadie's employment in the interim.  (Hancock Decl. Ex. 2 at 3.)  Hancock

---

[7]       Lacadie has filed a statement authored by Sheldy Shiver that discusses conduct involving Ms. Carson, Ms. Grant, Mr. Hancock, and Mr. Richard that Ms. Shiver witnessed in December 2005.  Ms. Shiver states that the group joked about Lacadie and "the kiss" and describes other ways they made fun of Lacadie.  These events appear to have transpired outside of Lacadie's presence.  (July 20, 2007, Shiver Letter, Doc. No. 17-6.)  In any event, the statement is unsworn and therefore not of evidentiary quality.

met with Lacadie and her attorney roughly a week later, on December 21, 2005, for purposes of a pre-termination hearing.  (DSMF ¶ 60.)  According to Hancock, Lacadie denied knowledge that her excise tax payments were improperly low and blamed Grant for any errors.  She did not raise an issue about lowering base values by deselecting options during the registration process.  (Id. ¶ 61.)  Lacadie agreed during her deposition that she had been given the opportunity to discuss her side of the issue and that her attorney had an opportunity to present information as well.  (Id. ¶ 62.)  Following the hearing, Hancock terminated Lacadie's employment by letter dated December 23, 2005.  He asserts that he did so because he had a duty to protect municipal resources and believed that Lacadie had used her position to deprive the Town of excise taxes that should have been paid.  (Id. ¶¶ 63, 64.)

Lacadie appealed the termination to the Milford Board of Selectmen.  (Id. ¶ 65.)  The appeals hearing transpired over several days and was completed by mid-January, 2006.[8]  (Id. ¶¶ 66, 67.)  The Board of Selectmen upheld the termination.  (Id. ¶¶ 68, 101.)  Despite these developments, Lacadie was elected to the Town of Milford Board of Selectmen in June 2006, and her term continues until June 2009.  (Id. ¶ 4.)

Lacadie believes that a complaint she filed with the Maine Human Rights Commission was a motivating factor in her termination.  The Town states that Lacadie believes there is a legitimate explanation for the issues concerning her motor vehicle registrations and that she also

---

[8]     Lacadie has filed a CD containing audio of the selectmen meetings that addressed her appeal.  She has written on the CD case a request that the Court listen to the meetings because they have more detail than what exists in the paper record.  Oddly, Lacadie makes no reference to the CD in her responsive statement of material facts or in her memorandum.  I confess that I have not listened to these recordings.  Requests such as this are one of the reasons Local Rule 56 exists:  to provide litigants with a procedural mechanism for bringing factual controversies directly to the Court's attention in focused statements supported by record citations.  Courts are not required or even expected to independently sift through the record in search of evidence that might salvage a *pro se* plaintiff's case.  Clarke, 473 F. Supp. 2d at 129 (observing that there is no obligation "to scour the record" on behalf of a plaintiff who opposes a summary judgment motion) (citing Stephanischen v. Merch. Despatch Transp. Corp., 722 F.2d 922, 931-32 (1st Cir. 1983)).  A contrary approach would effectively turn the Court into an advocate for the *pro se* litigant.  Id.

10

believes that Grant was manipulating Hancock to achieve her termination.  (DSMF ¶¶ 69-71.)
Lacadie admits these statements, but she does not offer any statements of her own by way of
explanation that are supported with a record citation.  With respect to two of the vehicles,
Lacadie believes it was appropriate to de-select certain options she did not think the vehicles had.
(Id. ¶73.)  However, Lacadie agrees that de-selecting options would not explain the improperly
low mil rate.  (Id. ¶ 76.)

Since Lacadie's termination it appears that the Town has had some other problems with
the TRIO system in relation to the base values it assigns for certain vehicles.  Lacadie has filed a
copy of some "selectmen comments" from the minutes of two 2008 board meetings and a
memorandum to the board of selectmen from the new town manager, in which the town manager
states that the TRIO system is not always consistent with the Red Book when it comes to base
value.  (Jan. 16 2008, Board of Selectmen Minutes, Doc. No. 17-2;  Feb. 20, 2008, Board of
Selectmen Minutes, Doc. No. 17-4;  Feb. 20, 2008, Town Manager Memo, Doc. No. 17-3.)
There is no indication that this information was available to Hancock or to the board of
selectmen when they were considering or reviewing Lacadie's termination.  There is no
indication in this information that the perceived discrepancies in Lacadie's registrations had
anything to do with Red Book base values as compared with the base values supplied by the
TRIO system.  There is also no explanation how this information would relate to the improperly
low mil rates for the Monte Carlo.

*

Count V (slander) and count VI (negligent infliction of emotional distress) appear to be
based on statements attributed to Grant, Hancock, and Richard.  According to Richard, he had
conversations with five individuals concerning Lacadie, but only after the Board of Selectmen

signed their written decision.  (Id. ¶¶ 103, 104.)  The content of those communications is not provided in a statement, but the Town cites pages 123-124 of Lacadie's deposition transcript to explain that the slander claim relates to Richard's remarks.  Page 123 reveals that Richard stated to these individuals words to the effect that Lacadie was dishonest in her business dealings.  (Id. ¶ 9;  Lacadie Dep. 123.)  Page 124 suggests that Hancock may have made some similar statements to unspecified individuals.  Finally, Lacadie contends that Grant made slanderous statements, including the allegations Grant made to Hancock about Lacadie's Monte Carlo registration.  (DSMF ¶ 10.)

The Town of Milford has not acquired insurance coverage for claims within the scope of the Maine Tort Claims Act immunity.  (Id. ¶ 105.)   The Town participates in the Maine Municipal Association Worker's Compensation Fund and has secured the payment of compensation in conformity with the Maine Workers' Compensation Act.  (Id. ¶ 106.)

## DISCUSSION

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merch. Ins. Co. v. U. S. Fid. & Guar. Co.,

143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Diane Lacadie's complaint recites seven counts:  (I) sexual harassment;  (II) employment discrimination;  (III) sexual assault;  (IV) hostile work environment;  (V) slander;  (VI) negligent infliction of emotional distress;  and (VII) intentional infliction of emotional distress.  In addition to these formal counts or causes of action, Lacadie's complaint includes an allegation of retaliation that is set forth in paragraph 10 of her complaint.  In a prior memorandum of decision addressed to Lacadie's much belated motion to amend, I concluded that her complaint already contained a retaliation claim that was sufficiently plead in deference to her *pro se* status.  (Mem. Dec. on Mot. to Amend at 2, Doc. No. 13.)  All of Lacadie's claims are asserted exclusively against the Town, the only named defendant.  In its summary judgment motion the Town requests judgment as a matter of law against all of Lacadie's claims.  I address Lacadie's state law tort claims first, before turning to her discrimination and retaliation theories.

## A.  State Law Tort Claims

Counts III, V, VI and VII are all Maine tort law claims that, according to Lacadie's memorandum of law, arise from Gibson's assault and what she describes as the ridicule that followed from it.  Lacadie also considers relevant to these claims the fact that Richard had several conversations with town residents concerning the termination of her employment.  It is fair to infer from the body of the summary judgment record that Lacadie would also incorporate the circumstances surrounding her termination in support of her emotional distress claims.  (Pl.'s Response to Def.'s Mot. for Summ. J. at 1-2, 6, Doc. No. 17.)

The Town argues that summary judgment against the tort claims is appropriate because the Town enjoys immunity under the Maine Tort Claims Act.  (Def.'s Mot. for Summ. J. at 16-18.)  It also argues that the personal injury claims are barred by the Worker's Compensation Act.  (Id. at 18-19.)  Finally, the Town argues that it cannot be held liable for statements made by Richard in a private setting because he is a solitary selectman and the Town is not vicariously liable for his private conduct.  (Id. at 19-20.)

The Town's first argument suffices.  Pursuant to the Maine Tort Claims Act:  "Except as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages."  14 M.R.S.A. § 8103(1).  "Only express statutory exceptions will overcome a governmental entity's immunity pursuant to section 8103(1)."  Donovan v. City of Portland, 850 A.2d 319, 321 (Me. 2004).  The Town of Milford is a governmental entity and all of Lacadie's tort claims seek money damages.  The exceptions set forth in the Maine Tort Claims Act concern property damage, bodily injury or death arising from negligent acts or omissions in regard to (1) the operation or maintenance of vehicles, machinery and equipment; (2) the construction, operation or maintenance of public buildings and their appurtenances; (3) the discharge of pollutants; and (4) the performance of road construction, cleaning or repair operations.  14 M.R.S.A. § 8104-A.  These exceptions are to be strictly construed in favor of immunity.  Id.  Lacadie fails to identify an exception that would permit her to recover damages in tort from the Town for an assault committed by a private contractor, for alleged ridicule by co-workers in the workplace, for defamatory statements made by a selectman,[9] for an allegedly wrongful termination, or for emotional injury arising from any or all of the foregoing claims, whether intentionally or negligently inflicted.  None of these claims

---

[9]      See City of Old Town v. Dimoulas, 803 A.2d 1018, 1025 (Me. 2002) (affirming the application of sovereign immunity in favor of the defendant city on a defamation claim arising from comments made by the city manager).

would appear to fit into any of the exceptions identified in section 8104-A.  Another possible

exception exists in section 8116 of the MTCA.  That provision states that liability exists for those

claims that a governmental entity secures insurance to cover.  14 M.R.S.A. § 8116.  The only

evidence available in the record demonstrates that the Town's insurance coverage does not

extend to any claims for which the Town would enjoy sovereign immunity.  Summary judgment

should enter for the Town on counts III, V, VI and VII.

### B.   Statutory Claims

The remaining claims consist of a sexual harassment/hostile work environment claim

(counts I and IV) and an employment discrimination claim under § 1983 (count II), including a

retaliation claim that is not listed as a separate count but is otherwise alleged in the complaint

(compl. ¶ 10).  The Town argues that the Gibson incident is not severe enough to ground a claim

of sexual harassment on its own and that Lacadie failed to administratively exhaust this claim to

the extent she would rely on any other incidents in the workplace (Def.'s Mot. for Summ. J. at 2-

5, 11-13);  that Lacadie cannot set forth a *prima facie* case of discrimination or demonstrate

pretext in relation to the Town's rationale for firing her (id. at 5-11);  and that "prompt and

appropriate corrective action" (the Town's language, not the Court's) satisfied the Town's only

legal obligations to Lacadie (id. at 13-16).  I conclude that the Town's motion should be granted

against the statutory claims because the record does not depict a hostile work environment and

Lacadie fails to make a sufficient pretext showing in relation to her termination.

### i.      Sexual harassment/hostile work environment

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment."  Meritor

Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (brackets and internal quotation marks

omitted).  This is the "'hostile environment' theory of sexual harassment."  Id. at 68.  A hostile

work environment claim requires that the plaintiff prove six things:

> (1) that she . . . is a member of a protected class; (2) that she was subjected to
> unwelcome sexual harassment; (3) that the harassment was based upon sex; (4)
> that the harassment was sufficiently severe or pervasive so as to alter the
> conditions of plaintiff's employment and create an abusive work environment; (5)
> that sexually objectionable conduct was both objectively and subjectively
> offensive, such that a reasonable person would find it hostile or abusive and the
> victim in fact did perceive it to be so; and (6) that some basis for employer
> liability has been established.

O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (citing Faragher v. City of

Boca Raton, 524 U.S. 775, 787-89 (1998);  Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-23

(1993);  Meritor Sav. Bank, 477 U.S. at 65-73).

In her responsive memorandum, Lacadie argues that the Gibson kissing incident was

severe enough on its own to justify a damages award against the Town because the incident

affected her emotional, psychological and physical well-being and because the Town essentially

did nothing to reprimand Gibson for his conduct.  (Pl.'s Response to Def.'s Mot. for Summ. J. at

2.)  Lacadie does not attempt to bolster her harassment claim with any reference to workplace

ridicule stemming from the Gibson incident or to any other workplace conduct having sexual

overtones.  These omissions effectively render the Town's concern about administrative

exhaustion[10] moot.  Lacadie advances her sexual harassment/hostile work environment claim

---

[10]       The law is that the scope of a hostile work environment lawsuit is limited by the scope of the administrative
charge that the plaintiff filed with the Equal Employment Opportunity Committee or its state equivalent, here the
Maine Human Rights Commission.  White v. N.H. Dep't of Corr., 221 F.3d 254, 263 (1st Cir. 2000).  More
precisely, "the scope of the civil complaint is . . . limited to the charge filed with the EEOC and the [administrative]
investigation which can reasonably be expected to grow out of that charge."  Powers v. Grinnell Corp., 915 F.2d 34,
37 (1st Cir. 1990).  "The critical question is whether the claims set forth in the civil complaint come within the scope
of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  White,
221 F.3d at 263.  In this case, regardless of whether the MHRC could be reasonably expected to investigate the
existence of sexual comments in the workplace based on a charge describing a solitary kissing incident and an
employer's response to it, Lacadie has not included in her legal argument any reference to sexual comments in the
office.  Even if Lacadie had incorporated this evidence into her legal memorandum, it is far too ambiguous to lend
appreciable aid to her cause.  There is no way to determine the frequency of these comments or who made them or
when in the course of her employment Lacadie overheard them.  Clearly, a finding that such comments were

based entirely on the Gibson incident and the lack of a disciplinary response by the Town.  For all practical purposes, this renders counts I and IV indistinguishable.

The Town's argument is that Gibson's unwelcome and forceful kissing of Lacadie on one occasion was not serious enough to alter the conditions of Lacadie's employment and create an abusive work environment.  This challenge goes to the fourth element outlined above:  whether the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.  I conclude that the cognizable facts of this case, such as they are, do not justify a finding that the isolated kissing incident altered the terms or conditions of Lacadie's employment relationship with the Town of Milford.

Whether harassment in the workplace can fairly be regarded as severe and pervasive turns on the following factors:  "the frequency of the discriminatory conduct;  its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23; Valentin-Almeyda v. Mun. of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006).  Case law related to "isolated incidents" holds that an isolated incident must be "extremely serious" to be actionable on its own.  Faragher, 524 U.S. at 788.  An isolated incident involving unwelcome physical contact is more likely to cross this threshold than an incident without physical contact.  Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 84 (1st Cir. 2006) ("While we do not preclude the

---

pervasive is flatly ruled out on this record.  There is no basis in the summary judgment record to infer that the women in the office were subjected to a steady diet of sexually charged comments.  Additionally, there is no basis to make a finding in Lacadie's favor with respect to the temporal proximity of these comments to the kissing incident. For example, there is no evidence upon which to rest an inference that any of these comments were made to Lacadie shortly before the kissing incident or shortly after it.  It is as like as not that they were all made well before the kissing incident, and scattered across a broad expanse of time, which would rule out a characterization that the work environment was permeated with intimidation, ridicule or insult.  Finally, as comments go, these are not exactly "severe" comments.  To be sure, they are inappropriate and, with more context, could very well help depict an actionable work environment, but in a contextual vacuum they cannot fairly be regarded as the kind of statements that would subject an employer to liability for fostering or tolerating a "hostile" work environment.  The lack of context also prevents these statements from transforming the kissing incident into anything other than an isolated incident, which is how it is discussed in the body of this Recommended Decision.

possibility of a single-incident hostile work environment claim based on exclusively verbal conduct, successful single-incident claims typically have involved unwanted physical contact."). Still, the presence of unwelcome physical contact is not necessarily sufficient in itself.  Burnett v. Tyco Corp., 203 F.3d 980, 984-85 (6th Cir. 2000) (holding that evidence of a single battery and two offensive remarks over six months did not establish a hostile environment);  Rivera-Martinez v. Puerto Rico, No. 05-2605, 2007 U.S. App. Lexis 160, 2007 WL 16069 (1st Cir. Jan. 4, 2007) (unpublished opinion) (affirming entry of summary judgment on a claim involving stroking of the arm and forceful contact designed to push the plaintiff out of an office).  One way this standard has been described is that an isolated incident must be serious enough that it transforms the workplace into an environment "permeated with discriminatory intimidation, ridicule, and insult."  Harris, 510 U.S. at 21 (internal quotation marks and citation omitted).

Outside of the First Circuit, a number of courts have precluded claims at the summary judgment stage that involved somewhat similar conduct to that presented here.  In Hockman v. Westward Communications, the Fifth Circuit affirmed an entry of summary judgment against a hostile work environment claim where the plaintiff had been "slapped on the behind" with a newspaper, "'grabbed or brushed' against . . . breasts and behind," more than once, and held by the cheeks for an attempted kiss, all perpetrated by a co-worker over an 18-month period.  407 F.3d 317, 328 (5th Cir. 2004).  The Eighth Circuit has also affirmed the entry of summary judgment in a case involving offensive physical touching.  In Meriwether v. Caraustar Packaging Company, a co-worker forcefully "grabbed [the plaintiff's] buttock" and, the next day, blocked her path and joked about the incident.  326 F.3d 990, 992 (8th Cir. 2003).  The Court concluded that the co-worker's conduct was not severe enough to alter the conditions of the plaintiff's employment and create an abusive environment.  Id. at 993.  The Seventh Circuit appears to be

of like mind.  In <u>Adusumilli v. City of Chicago</u>, the Court affirmed the entry of summary

judgment on a hostile work environment claim where a co-worker who had minimal contact with

the plaintiff had on four occasions "briefly touched her arm, fingers, or buttocks."  164 F.3d 353,

357, 361 (7th Cir. 1998).[11]  In <u>Hostetler v. Quality Dining, Inc.</u>, the Seventh Circuit offered this

assessment of the physical touching issue:

> Physical harassment lies along a continuum just as verbal harassment does.  There
> are some forms of physical contact which, although unwelcome and
> uncomfortable for the person touched, are relatively minor.  Cumulatively or in
> conjunction with other harassment, such acts might become sufficiently pervasive
> to support a hostile environment claim, but if few and far between they typically
> will not be severe enough to be actionable in and of themselves.  A hand on the
> shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum.  Even
> more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips,
> a pinch of the buttocks—may be considered insufficiently abusive to be described
> as "severe" when they occur in isolation.

<u>Hostetler v. Quality Dining, Inc.</u>, 218 F.3d 798, 808 (7th Cir. 2000) (emphasis added).  The

Hostetler Court did, however, hold that a particularly forceful kissing assault followed the next

day by another assault by the same co-worker did expose the employer to liability:

> The physical, intimate, and forcible character of the acts at issue here persuades
> us that a factfinder could deem Hostetler's work environment hostile.  Accepting
> Hostetler's version of events as true, her co-worker did not simply steal a quick
> kiss from her lips, but, holding her face in his hands, forced his tongue into her
> mouth. When Hostetler subsequently used her body to shield herself from an
> apparent repeat of that intrusion, Payton began to unfasten her bra, threatening to
> do so completely and stopping only when another employee entered the office.
> . . .  A factfinder reasonably could interpret the alleged course of conduct as
> sufficiently invasive, humiliating, and threatening to poison Hostetler's working
> environment—indeed, overtones of an attempted sexual assault can be seen in the
> second incident in particular.

---

[11]    In a rather surprising recent case, the United States District Court for the District of Columbia granted
summary judgment against a sexual harassment claim where a *supervisor* touched the plaintiff's buttocks, hugged
her, touched her thigh and tried to kiss her on more than one occasion.  <u>Akonji v. Unity Healthcare, Inc.</u>, 517 F.
Supp. 2d 83, 97-98 (D.C. 2007).

Id. at 809.[12]  In addition to these two assaults, the Hostetler record reflected troubling facts regarding the employer's response to the plaintiff's complaints, including an accusation that she was lying, a statement that she was "a problem," a threat to transfer her, an immediate inquiry of the plaintiff's direct supervisor whether there were any problems with the plaintiff's work performance, and a suggestion that there was a problem because the plaintiff had left work after being assaulted.  Finally, the employer transferred the plaintiff within a week to a remote location.  Id. at 803-804 & nn. 1 & 3.

Returning to the instant case, the Court must consider whether a solitary kissing incident perpetrated by a co-worker subjects the Town of Milford to liability for money damages.  What is known is that the incident was unwelcome, was never repeated, and was perpetrated by an individual who was in the workplace one day per week.[13]  Lacadie's immediate response was not one of outrage or emotional upset and she has not introduced any evidence that there was a negative impact on her work performance or even on her attitude toward the workplace.[14]  There is evidence that trouble later arose when Lacadie eventually refused to work in the same office as Gibson after he performed a revaluation of a property owned by Lacadie's son, but this did not arise until four or five months after the kissing incident.  Based on these circumstances, I conclude that the summary judgment record is not sufficient to support a finding that Lacadie's workplace became a place of intimidation, ridicule and insult following the isolated kissing incident.  I draw this legal conclusion (a) because this isolated incident was perpetrated by a co-

---

[12]      Additional Seventh Circuit cases involving unwelcomed touching or kissing include Saxton v. American Tel. & Tel. Co., 10 F.3d 526 (7th Cir. 1993), and Weiss v. Coca-Cola Bottling Co., 990 F.2d 333 (7th Cir. 1993).

[13]      The depiction of the kissing incident itself lacks relevant detail.  Lacadie emphasizes that she was "straddled" in her chair, but she does not indicate whether she felt trapped or pinned.  The duration of the incident is also omitted.

[14]      In her memorandum of law, Lacadie states: "After the incident, the Plaintiff sought medical attention because of her emotional and psychological well being and the effect it was having on her physical well being, i.e., her back injuries due to digging herself when under severe stress."  (Pl.'s Response to Def.'s Mot. for Summ. J. at 2.)  There is no record citation in support of any of this.

worker who had only limited contact with the plaintiff in the workplace;  (b) because there is no evidence to suggest that Lacadie regarded Gibson as a threat to her safety during the incident;  (c) because there is no evidence that Lacadie ever feared that Gibson was likely to repeat such behavior in the future;  (d) because there is evidence that Gibson was spoken to and cautioned not to repeat such conduct;  and (e) because there is no evidence that the incident adversely affected Lacadie's work performance.[15]  Accordingly, I recommend that summary judgment enter on Lacadie's sexual harassment/hostile work environment claim (counts I and IV).

ii.    *Discriminatory discharge*

Count II asserts an employment discrimination claim in relation to Lacadie's eventual termination.  In the heading of count II, Lacadie identifies the claim as arising under section 1983 of the Civil Rights Act.  The Town treats this claim as a Title VII claim because Lacadie alleges that gender was a motivating factor in the Town's decision to discharge her.  (Def.'s Mot. for Summ. J. at 5.)  Lacadie goes along with this characterization, arguing that she has a trial-worthy claim that the Town's decision to terminate her was motivated by the fact that she filed a complaint with the Maine Human Rights Commission.  (Pl.'s Response to Def.'s Mot. for Summ. J. at 3-5.)  Because Lacadie does not offer any theory why this claim would fall under section 1983, other than by reading the protections of Title VII into section 1983, I, too, construe the claim as another Title VII claim.  I also construe the claim as a retaliation claim.  Lacadie testified at her deposition that she does not believe she was terminated because she is a woman,

---

[15]      The Town's motion invites the Court to expressly find that the isolated incident of forcefully kissing someone on the mouth  is not "extremely serious."  I have declined to accept that invitation, but I acknowledge there is some tendency in the case law to place discrete incidents in a definite location along the continuum of physical harassment.  However, I do not believe that the purely physical characteristics of this isolated  incident control the case.  Instead, my conclusion is that the incident, serious though it may be, must be placed into the context of the workplace.  This particular case turns on the absence of any evidence regarding any serious impact on Ms. Lacadie's perception of  the terms and conditions of her employment.  There simply is no evidence that the event transformed the workplace, from Lacadie's perspective or from an objective perspective, into an environment permeated with intimidation, ridicule or insult, or into a place where it was a basic term or condition of employment that women endure hostile or abusive treatment from men by virtue of sex.

but that she feels "it was all [a consequence of] the Maine Human Rights Commission."[16] (Lacadie Dep. 122.)

In section II of its initial memorandum, the Town argues that it had a legitimate, non-discriminatory justification for terminating Lacadie's employment and that she cannot create a genuine issue whether that justification is a pretext for discrimination.  The Town's offer of a legitimate, nondiscriminatory justification for Lacadie's termination would apply with equal force whether Lacadie's disparate treatment claim is characterized as a termination motivated by her sex or by her protected activity of filing a charge of discrimination with the Maine Human Rights Commission.  Given the state of the record, the Town is correct that Lacadie cannot generate a trial-worthy issue.  It is apparent from her responsive memorandum that Lacadie did not understand the true focus of the Town's argument.[17]  Lacadie devotes a great deal of her memorandum to a discussion of her qualifications and work performance, issues that are not really put in dispute by the Town's motion.

In this case, Lacadie would have to first establish a *prima facie* claim of retaliatory discharge.  A *prima facie* case of retaliation requires evidence (1) that the plaintiff engaged in protected activity;  (2) that the employer subsequently subjected her to an employment measure that was objectively and materially adverse, as in the kind of retaliation that would "dissuade a reasonable worker from making or supporting a charge of discrimination," Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53, __, 126 S. Ct. 2405, 2409 (2006);  and (3) that "there existed a causal link between the protected activity and the adverse job action," Benoit v. Tech.

---

[16]      In her motion to amend, Lacadie asked that her retaliation claim be placed under count I.  However, I relegate it to count II because count II is the count that Lacadie designated to contain whatever federal claim might arise from the fact that the Town terminated her employment.  (See Mem. Dec. on Mot. to Amend at 2.)

[17]      In its reply memorandum the Town argues that the retaliation claim is barred because it was never exhausted administratively.  (Def.'s Reply Mem. at 4-5, Doc. No. 19.)  I have relegated this argument to another footnote because a claim that the employer retaliated against the employee in response to the filing of a charge of discrimination is a claim that is "reasonably related to and grows out the discrimination complained of to the agency."  Clockedile v. N.H. Dep't of Corr., 245 F.3d 1, 6 (1st Cir. 2001).  See note 10, supra.

Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003).  Contrary to what Lacadie evidently understood, she was not required to prove that she was qualified for the job that she held.  As far as the actual test is concerned, Lacadie could quite readily establish all three elements.  The first two are obviously met, without any need for discussion.  The third element she could establish from the fact that her termination proceedings commenced within a couple months of her charge of discrimination, with the underlying investigation starting when word of her intent to sue the Town came to co-employee Grant's ears.  Close temporal proximity alone is sufficient to justify an inference of causation for purposes of the "light burden of establishing a prima facie case of retaliation."  Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007).  This evidence satisfies Lacadie's *prima facie* burden, which shifts to the Town the even lighter burden of putting forward a legitimate, non-retaliatory explanation for discharging her.  This is merely a burden of production, not persuasion, as the burden of proving retaliation or discrimination always remains with the plaintiff.  See Lewis v. City of Boston, 321 F.3d 207, 214 (1st Cir. 2003).  The Town has put forward a legitimate explanation for the termination.  That explanation is supported not just with argument, but also with an evidentiary presentation.  This jostles the burden back onto Lacadie's shoulders.  She must present evidence that the Town's justification for discharging her is merely a pretext for retaliation;  evidence, in other words, that the justification is unlikely to be true, such as will make it a fair inference that retaliatory animus was the real motivation for her termination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 515-16 (1993).

The justification offered by the Town is a good one.  The Town states that it found Lacadie to have abused her office for financial gain by manipulating the vehicle registration system to avoid paying the entire excise tax her family owed on three vehicles over multiple

years.  This determination was first made by Hancock, whom Lacadie herself regards as

someone who was not motivated by retaliatory animus.  Hancock sought an independent opinion

from the software manufacturer to determine whether his own findings of misconduct were

likely correct.  That expert concurred that the entries for the Lacadie registrations could only be

explained by manual entries, including manual override of the default mil rates.  This

determination of wrongdoing and the decision to discharge Lacadie from employment was then

reviewed and affirmed by the Town of Milford Board of Selectmen.  Lacadie fails to expose this

justification as a pretext.  As the summary judgment record stands, Lacadie merely "believes" it

was appropriate to de-select certain options she did not "think" the vehicles had and she offers no

explanation for the incorrect mil rates.  That simply does not generate an inference of a

retaliatory motive.  Finally, although Grant's decision to air Lacadie's dirty laundry was

motivated by retaliatory animus over Lacadie's decision to sue the Town, Grant was merely a co-

worker without authority to discharge Lacadie and there is no suggestion in the record that the

laundry was not honestly regarded by the decision-makers as dirty.  Nor is there any evidence

that Hancock or the Board were merely Grant's "cat's paws."[18]  Although Grant tipped Hancock

off to significant possible misconduct, there is no evidence that Grant had any leverage or

influence over Hancock's investigation or his decision to terminate Lacadie.  Nor is there

evidence that Grant had any influence over the Board of Selectmen's decision to affirm

---

[18]       In order to attribute the animus of a co-worker to the ultimate decision maker, the evidence must
demonstrate that the co-worker exercised influence or leverage over the decision maker.  Cariglia v. Hertz Equip.
Rental Corp., 363 F.3d 77, 85 (1st Cir. 2004);  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st
Cir. 1990).  The summary judgment record in this case does not reflect that Grant exerted any influence over
Hancock's decision-making process or over a majority of the selectmen.  Nor is there any evidence that Grant
manipulated the vehicle registration records related to the Lacadie vehicles.  The fair inference is that there was
animosity between Grant and Lacadie going back to the 2002 vehicle registration's incident, that Grant was probably
annoyed that Lacadie was receiving paid administrative leave on Wednesdays over the Gibson incident, and that
Grant spoke up when she learned that Lacadie was planning to sue the Town.  To suggest that Hancock could have
ignored such a serious allegation because it arose in the midst of a Maine Human Rights Commission complaint is to
suggest that an employer cannot investigate employee misconduct because a discrimination claim is also under
investigation.

Hancock's decision.  I recommend that summary judgment be granted for the Town on Lacadie's claim of retaliatory discharge.

## Conclusion

For the reasons set forth above, I RECOMMEND that the Court GRANT the Town of Milford's motion for summary judgment on all counts (Doc. No. 11).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

May 1, 2008

25